IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                Plaintiff/Counter-Defendant,

vs.                                      Civ. No. 03-1450 ACT/RHS

JERRY FENNELL and ADAM MARQUEZ,

                Defendants/Counter-Plaintiffs.

MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary Judgment regarding Federal Ownership and Management of the Subject Lands filed March 1, 2005 (Docket No. 43) and Defendants' Motion for Summary Judgment on Land Status Issues filed March 1, 2005 (Docket No. 45).  The Motions were filed pursuant to a Stipulated Order Setting Filing and Briefing Schedule for Cross-Motions for Summary Judgment Regarding Land Status.  Docket No. 32.  The parties are seeking a ruling as to whether Plaintiff owns the land at issue in this matter.  Upon review of the pleadings and being otherwise advised in the premises, the Court finds that Plaintiff's Motion for Partial Summary Judgment regarding Federal Ownership and Management of the Subject Lands will be granted and Defendants' Motion for Summary Judgment on Land Status issues will be denied.

**Background.**

Plaintiff filed a "Complaint for Trespass & Ejectment, Damages and Injunctive Relief" ("Complaint") on December 19, 2003. Docket No. 1. The Complaint alleges that this action "arises under common law trespass, the National Forest Organic Administrative Act of 1897, 16 U.S.C. § 551, and regulations of the Secretary of Agriculture, 36 C.F.R. §§ 228, 251, and 261." Complaint, ¶1. The Complaint asserts that the lands and buildings occupied by Defendants are within the Lincoln National Forest ("LNF"). Complaint, ¶¶ 5,6,7,15,16, and 17. Paragraphs 17 through 30 of the Complaint allege that there have been more than ten years' worth of attempts, on "numerous occasions," to convince "Defendants to cease their unauthorized occupancy and residency of the lands..." Defendants filed their Answer and Counterclaims ("Answer") on May 3, 2004. Docket No. 8. Defendants claim they are owners of unpatented mining claims under the 1872 Mining Law and that their residency is incident to their alleged gold mining. Answer, p.2., ¶¶ 16, p. 25-26, ¶¶ 23-26. Defendants assert that the subject land is not Federal land and not part of the LNF. Answer, p.2., ¶ 5, p. 11-16, ¶¶ 3-9, pp. 21-22, ¶¶ 8-11; pp. 29-30, ¶ 41.

**Quiet Title Act**.

To the extent that the Defendants are attempting to adjudicate title to the land at issue, the Court does not have jurisdiction. To quiet title in public lands, suit must be brought under the Quiet Title Act, 28 U.S.C. § 2409a. The Quiet Title Act permits the United States to be named as a party defendant in a civil action "to adjudicate disputed title to real property in which the United States claims an interest, other than a security interest or water rights." *Id*. The Quiet Title Act requires Defendants to assert "with particularity the nature of right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." *Id*. at 2409a(d). Defendants have neglected to do so and any claim

2

pursuant to the Quiet Title Act by the Defendants must therefore fail.

**Legal standard.**

Under Rule 56, any party may move for summary judgment.  Fed. R. Civ. P. 56(a) and (b).
The moving party initially carries the burden of pointing out to the trial court that there is an absence
of evidence to support the nonmoving party's case, although the moving party need not affirmatively
negate the nonmovants claim in order to obtain summary judgment.  *Allen v. Muskogee, Oklahoma*,
119 F.3d 837, 849 (10th Cir. 1997), *cert. denied*, 528 U.S. 1148 (1998) (citing *Celotex v. Catrett*,
477 U.S. 317, 322-23 (1986)). Once the movant has met this burden, the nonmoving party must go
beyond the pleadings and show that a genuine issue of material fact exists that would require a trial.
*Bacchus Industries., Inc. v. Arvin Industries., Inc*., 939 F.2d 887, 891 (10th Cir. 1991).  In ruling on
a summary judgment motion, the Court examines the factual record and all reasonable inferences
therefrom in the light most favorable to the nonmoving party.  *Allen,* 119 F.3d at 839-40.  Where the
record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there
is no genuine issue for trial.  *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  As to
materiality, the substantive law will identify which facts are material.  Only disputes over facts that
might affect the outcome of the suit under the governing law will properly preclude the entry of
summary judgment.  *Id.*

**Factual background.**

 The parties do not dispute the following facts:

1.      Defendants' unpatented mining claims are located within an area in New Mexico
        know in official surveys as portions of Sections 3, 14, 15, 22 and 23 of Township
        5 South Range 12 East (T5S R12I).

3

2.      The subject area is included within an official survey by the United States

Department of the Interior, General Land Office in 1928, which survey was

approved in 1930.

 The Court finds that the following additional facts have been established by the Plaintiff.  The

subject area is located within lands acquired by the United States of America through the Treaty of

Guadalupe Hidalgo in 1848.  The lands on which the subject area is located have never left the

ownership of the United States of America since they were acquired through the Treaty of Guadalupe

Hidalgo.  The subject area is located within lands added to the LNF through the Presidential

Proclamation of President Theodore Roosevelt, dated April 24, 1907 ("1907 Proclamation").  There

were no exceptions within the subject area to the 1907 Proclamation.

Plaintiff submitted affidavits and declarations from the following individuals in support of

these facts:

1.      Kenneth Calhoun is the Geographic Information Systems (GIS) Manager for Daniel
        B. Stephens & Associates, Inc. in Albuquerque New Mexico.  He provides in his
        affidavit geographic perspectives of the subject area.  He states that there are a
        "number of unpatented mining claims" within the subject area.  Exhibit 1, Calhoun
        Affidavit, ¶ 4.

2.      Patrick J. Hickey is the Regional Land Surveyor, for Region 3 of the United States
        Forest Service.  Exhibit 2, Hickey declaration, ¶1  He attaches  to his declaration
        the Forest Service Land Status Plat of the lands in the subject area and states that
        the "Status Plat is a part of the official United States Forest Service land status
        record system, and shows the land status of the area within this Township."  *Id*. at

4

¶ 11.  Additionally, "[a]ccording to the Forest Services' official land status record system, and as shown by the attached Status Plat, the areas encompassed by the unpatented mining claims listed above is and has been in the ownership of the United States of America, United States Forest Service, and identified as reserved public domain, with an action (Presidential Proclamation by President Theodore Roosevelt) of April 24, 1907."  *Id*. at ¶ 13.  Moreover, the Status Plat shows that "[t]here are no townsites, homesteads, settlements, or other conveyances out of the United States ownership" in the subject area.  *Id*. at ¶ 16.

Hickey filed a second declaration as Exhibit 1 to Plaintiff's Response to Defendants' Motion for Partial Summary Judgment.  In this declaration he states that notes on Status Plats have nothing to do with land status or ownership of the land.  *Id*. at ¶ 4. He further states that the "feature or point of reference labeled "Jicarilla" on the Status Plat is not itself a patented area, and is not within a patented area."  *Id*. at ¶ 6.

3.    Marcella Montoya is a Supervisory Legal Technician of the United States Bureau of Land Management ("BLM"), New Mexico State Office.  Ms. Montoya is the official custodian of the BLM'S land and mineral status records in the BLM New Mexico State Office.  Attached to her declaration is a copy of the "BLM's Township Survey Plat and BLM's Master Title Plat for the area known as Township 5 South Range 12 East New Mexico Principal Meridian."  Exhibit 3, Montoya declaration, ¶¶ 6 and 7.  Also attached is a certified copy of the April 24, 1907 Proclamation by President Theodore Roosevelt (Lincoln National Forest, New

Mexico, Fourth Proclamation), with the diagram that forms a part of this Proclamation.   In a second declaration Ms. Montoay has attached is a certified copy of the general  field survey notes for the BLM's Township Survey Plat for the area known as Township 5 South Range 12 East New Mexico Principal Meridian.  Exhibit 4, Montoya declaration, ¶ 6.

4.      John N. Patterson is an attorney with the firm of Scheuer, Yost & Patterson, Santa Fe, New Mexico.  He states that it is his "opinion that the Subject Property is the property of the United States of America, has been owned by the United States of America since February 2, 1848, the date the area including New Mexico was ceded to the United States."  Exhibit 5, Patterson affidavit, ¶ 19.  The affidavit also states that it is his "opinion that the Subject Property is part of the Lincoln National Forest, and has been since April 24, 1907." *Id.*

5.      Ida T. Viarreal is a Land Law Examiner for the BLM.  Attached to her declaration are "certified copies of the current location notices for [certain] unpatented mining claims within the LNS."  Exhibit 6, Viarreal declaration, ¶ 4.

The Court finds that the following facts have been established by the Defendants.  Defendants occupy the subject area.  The area occupied by Defendant Fennell is identified as "Jicarilla" on a Forest Service map.  "Jicarilla" was a Hispanic settlement by the mid-nineteenth century, when Mexican miners panned for gold.  In 1892, a United States Post Office was established at Jicarilla which remained opened for most of the time until the 1940s.  In 1893, a group of miners filed a document in the Lincoln County land records to more formally organize the Jicarilla Mining District. The survey completed in 1928 and accepted in 1930 shows "several  houses, windmills, cabins, log

buildings, patented mineral claims and a school house in Jicarilla."  Brief in Support of Defendant's Motion for Summary Judgment on Land Status Issues ("Brief in Support"), p. 6.  No such specific information was provided with respect to the land occupied by Defendant Marquez.

In support of these and other "facts," Defendants attached the following exhibits to their Brief in Support:

Exhibit 1 - an journal article by Edgar B. Heylmun, Ph.D. entitled "Jicarilla Gold Places, New Mexico" from the publication entitled *California Mining Journal*, December 1988.  The article discusses the history, geology, placer gold and land ownership in the Jicarilla Mining District.

Exhibit 2 - are pages from a book entitled *New Mexico in Maps* edited by Jerry L. Williams. The pages attached concern " Abandoned Hispanic Settlements."

Exhibit 3 - a newspaper article from the Daily New Mexican dated June 15, 1877 which discusses the Jicarilla mines in Lincoln County.

Exhibit 4 - a newspaper article from the Lincoln County Leader, April 12, 1890 which discusses the value of the ore in Jicarilla.

Exhibit 5 - a statement concerning the proposed post office in Jicarilla dated November  of 1892.

Exhibit 6 - the Articles of Association of the Jicarilla Water and Mining Company which were notarized on March 4, 1890.

Exhibit 7 - a map entitled Post Route Map of the Territory of New Mexico "Showing Post Offices With The Immediate Distances And Mail Routes In Operation On The 1st Of June, 1901."

Exhibit 8 - a map of the Territory of New Mexico from the records of the General Land Office, dated 1903.

Exhibit 9 - an article concerning the post office in Jicarilla and mining activities.

Exhibit 10 - a telegram dated November 18, 1905 from the Department of the Interior to the Register in Roswell, New Mexico and a letter from the Secretary of the Interior dated November 16 1905 withdrawing some lands from settlement under the public land laws.

Exhibit 11- the Presidential Proclamation of April 24, 1907 adding lands to the LNS.

Exhibit 12 - an article from the National Banker, dated April 25, 1908 concerning the Jicarilla mining district.

Exhibit 13 - a document from the Post Office Department, dated September 29, 1894 regarding the location of the post office in Jicarilla.

Exhibit 14 - a Department of the Interior, General land Office survey dated March 27, 1930.


Exhibit 15 - an article entitled "Placer Gold Deposits of New Mexico" from the Geological Survey Bulletin 1348 in 1972 which states, *inter alia*, that mining has been going on for more than 100 years.

Exhibit 16 - entitled "Map Showing Location of Placer Gold Deposits in New Mexico" from the U.S. Dept. of Interior, Geological Survey.

Exhibit 17 - an article entitled "Logging Railroads of the Lincoln National Forest" by Vernon J. Glover, Cultural Resources Management Report, No. 4, USDA Forest Service, Southwestern Region, September of 1984.

Along with their Reply Brief, Defendants submitted an affidavit of Margie Schell, a paralegal with the Modrall Sperling Law Firm. Attached to the affidavit are recorded entries of the mining records of Lincoln County, New Mexico from 1885 to 1910. Exhibits A, B, and C, Schell affidavit.

**Discussion.**

Plaintiff asserts that the lands at issue were acquired by the United States in 1848 through the Treaty of Guadalupe Hidalgo, that the lands have never left federal ownership and that these lands have been part of the LNF since President Theodore Roosevelt's 1907 Presidential Proclamation ("1907 Proclamation").  Defendants assert that the subject lands were either never federal lands or if they were, were excluded under the provisions of the 1907 Proclamation.

> 1.     *United States ownership of Federal lands in New Mexico*.

Title to the public lands within what would become the State of New Mexico was obtained through three separate acquisitions:  (1) on February 2, 1848, a large tract of land, some of which is now contained within New Mexico, was ceded to the United States by Mexico following the Mexican-American War as set forth in the Treaty of Guadalupe Hidalgo, 9 Stat. 922; (2) other lands were acquired in the 1850 Texas boundary settlement, 9 Stat. 446; and (3) the remaining lands were purchased from Mexico as part of the Gadsden Purchase in 1853, 10 Stat. 1031.  *United States v. Louisiana*, 363 U.S. 1 (1960).

The significance of the Treaty of Guadalupe Hidalgo is explained in the Patterson affidavit, ¶ 9.

> Under the Treaty of Peace between the United States and Mexico following the end of the Mexican War, commonly referred to as the Treaty of Guadalupe Hidalgo after the city in Mexico in which the treaty was executed on February 2, 1848, all lands ceded to the United States became the property of the federal government except for such lands as were privately owned. *Territory v. Persons in Delinquent Tax List*, 76 P. 316, 12 N.M. 169 (NM 1904).  Consequently, all land in New Mexico is the property of the federal government unless it was privately owned on February 2, 1848, or the federal government has sold or otherwise conveyed the property since that date.

Moreover, as stated by the United States Supreme Court,

...by the Treaty of Guadalupe Hidalgo, the United States ...acquired from Mexico the whole of New Mexico, part of which Texas had claimed by its boundary statute. To settle the conflict thus created between the United States and Texas to that portion of New Mexico, the United States in 1850 paid Texas $10,000,000 to relinquish its claim to the area, 9 Stat. 446, thereby consummating the final step in the establishment of Texas' disputed land boundaries...the portion of the 1848 boundary which encompassed not only eastern New Mexico, to which Texas had a very doubtful claim, but also western New Mexico and California, which it had never claimed, obviously was not pressed against Mexico on Texas' behalf and was not intended to validate its claim to eastern New Mexico.

*United States v. Louisiana*, 363 U.S. 1, 58-59 (1960).

The Treaty of Guadalupe Hidalgo set the international land boundaries between the United States and Mexico. The 1850 Compromise settled the controversy as to the internal boundaries of lands that were by then totally within the United States-the boundaries between the states of Texas and New Mexico. *Id.* at 107.

Defendants contend that Plaintiff "has failed to account for any chain of title through the possible period of ownership by the State of Texas." Response, p. 6. Defendants assert that Texas became a state in 1845, was not part of the Treaty of Guadalupe of 1848 and owned some land prior to 1850 Compromise that was later ceded to New Mexico. Defendants assert that some land in New Mexico was not part of the Treaty of Guadalupe and specifically that the subject area was not acquired by the United States through the Treaty of Guadalupe Hidalgo.

However, Defendants provide no evidence or basis to support their claim that the subject area was not ceded to the United States through the Treaty of Guadalupe Hidalgo. Defendants merely cite to *United States v. Louisiana*, 363 U.S. 1 (1960) which does not support their position. Defendants did not provide a map or survey in support of their position. Defendants do not "specifically controvert" Plaintiff's undisputed Fact No. 2 with states that "[t]he subject area is located within lands acquired by the United States of America through the Treaty of Guadalupe Hidalgo in 1848."

10

Fed R. Civ. P. 56(e); D.N.M.LR Civ. 56. This fact is supported by the affidavits of Calhoun, a GIS expert, and Patterson, a real estate attorney. Both reviewed the official land status documents of the subject area and concluded that the subject area is lands the United States acquired through the Treaty of Guadalupe Hidalgo. Defendants assert that this fact is an improper legal conclusion by Plaintiff's experts and thus should be stricken. The Court in a separate Memorandum Opinion and Order has denied Defendants' Motion to Strike.

Finally, Defendants assert that the surface area did not become a part of the United States because there were Hispanic settlers in the area before it became a part of the United States. Defendants have provided no admissible evidence to support this assertion. As discussed by the Court in its Memorandum Opinion and Order granting Plaintiff's Motion to Strike, the newspaper article from the Daily New Mexican that Defendants offer in support of this assertion is not admissible evidence. In any event, the article does not identify the area where the miners were located other than in the Jicarilla Mountains. There is no evidence that the miners were on the subject lands. Furthermore the article states that "[t]he Jicarilla mines are located entirely on public lands belonging to the United States Government, so there will be no trouble there about Mexican land grants." Defendants Exhibit 3.

The Defendants have not identified an exception to the Treaty of Guadalupe Hidalgo. Moreover, Patterson states in his affidavit that any private Mexican mining interest that may have existed in the subject area before it became part of the United States would not have been excepted from the operation of the Treaty of Guadalupe Hidalgo. Patterson affidavit, ¶9. This conclusion is confirmed by the fact that there is no land grant anywhere in Lincoln county. *Treaty of Guadalupe Hidalgo: Definition and List of Community Land Grants in New Mexico*, United States Government

Accountability Office (f/k/a United States General Accounting Office), September 2001, www.gao.gov/new.items/d01951.pdf.

2.    *Land at issue is part of the Lincoln National Forest.*

Lands were first reserved for National Forest purposes pursuant to the Creative Act of 1891, § 24, 26 Stat. 1095, 1103 (1891), repealed by Federal Land Policy and Management Act, § 704(a), 90 Stat. 2743, 2792 (1976).  Pursuant to the Creative Act, the President was empowered to "set apart and reserve...any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the President shall, by proclamation, declare the establishment of such reservations and the limits thereof."  Creative Act of 1891, Ch. 561 § 24, 26 Stat. 1103.

In 1897, Congress passed the Forest Service Organic Administration Act of 1897, 30 Stat. 34-36 (1897) ("Organic Act").  The Organic Act provided for the continued reservation of areas of forest reserves by Presidential Proclamation.  It also reopened the forest to mineral entry but provided that lands within forest reserves would be subject to the federal mining laws and subject to rules and regulations that governed those forest services. 16 U.S.C. §§ 473-82; *Wilderness Society v. Dombeck*, 168 F.3d 367, 374 (9th Cir. 1999).

The subject area is part of the lands added to the Lincoln National Forest through the Presidential Proclamation of President Theodore Roosevelt, dated April 24, 1907.  Calhoun affidavit, ¶10.  The 1907 Proclamation states in part:

> WHEREAS, it appears that the public good would be promoted by adding to the Lincoln National Forest certain lands...which are in part covered with timber, and by excluding therefrom certain lands; ...[e]xcepting from the forest and effect of this proclamation all lands which are at this date embraced in any legal entry...or upon which any valid    settlement had been made pursuant to law..

Defendants do not assert that the land at issue is not within the mapped area that is part of the 1907 Proclamation.  Rather, Defendants assert that the land at issue is not part of the LNF because: 1) the land was settled and therefore excluded from the 1907 Proclamation; and 2) Congress intended to exclude the land because it is more valuable if used for mineral and agricultural purposes.

*a.      Settlement exclusions.*

There are valid exclusions in the 1907 Proclamation.  As stated by the Ninth Circuit Court of Appeals, "[t]he exceptions expressed in the proclamation are three,--lands'embraced in a legal entry,' or 'covered by a lawfuling filing of record,' and 'lands 'upon which any valid settlement has been made by law.'"  *Holmes v. United States*, 118 F. 995, 998 (9th Cir. 1902).

"Legal entries" is a term that "includes all methods of the acquisition of the equitable title of public lands, prior to the passing of the legal title by the government patent..[and]...covers a homestead and town-site entry..."  *United States v. Northern Pac. Ry. Co*., 204 F. 485, 487 (D.Mt. 1911).  The United States Land Department defined "entry" as "...that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country by filing his claim thereto with the proper land officer of the United States."  *Id*.  Defendants' description of a dot, label or designation of a place on a map, the presence of a post office, a mining camp or building are not evidence of a legal entry, homestead or settlement. Placement of structures by people living on public lands does not effect a transfer of ownership from the United States as a patent is required in order for fee title to public lands to pass from the United States.  *Bockfinger v. Foster*, 190 U.S. 116 (1903).

13

A homestead entry or other settlement requires not only a settlement on the public domain (such as establishing lines, building a home and living on that land) but also application for purchase and receipt of a patent after the lands were surveyed.  *U.S. v. Hurlburt*, 72 F.2d 427 (10th Cir. 1934); *City of Guthrie v. Beamer*, 3 Okla. 652 (1895); *Stockley v. U.S.* 260 U.S. 532 (1923).

Defendants have submitted no evidence of such an application or patent for the lands. Defendants' evidence that a 1928  survey (accepted in 1930) showing that there were some transients in the area is not sufficient to demonstrate a valid homestead, legal entry or other settlement.

> One settling upon public domain in advance of public survey acquires no right, except the preferential right to secure the land after it has been surveyed and offered for settlement. There is nothing in the essential nature of the mere acts of entering upon unsurveyed public land, residing thereon, and improving it with the intention of fling on it as a homestead, that confers upon the settler a vested right or claim to the land, and such actions in no wise impair the power of the government to set aside the land for any public use.
> *Hurlburt*, 72 F.2d at 428.

The general field notes of that survey are in accord:  "The settlement is confined to the homestead entries in secs, 4, 31, and 36.  There are also some transient miners and prospectors living in the mineral area."  Montoya affidavit, Exhibit "4", ¶ 6; Hickey declaration ¶ 16.  It is undisputed that the subject area is in Sections 3, 14, 15, 22 and 23.

Defendants claim that a townsite existed also fails.  Formation of a townsite on public lands require a number of formal steps, such as proof of residence and improvements, platting of streets, lots, blocks and alleys, filing of necessary papers with the United States Land Office, and granting of a receipt and patent.  *Carson City v. Capital City Entertainment, Inc.,* 118 Nev. 415, 417-418, 49 P.3d 632, 633 (2002), quoting from *Lockwitz v. Larson,* 16 Utah 275, 52 P. 279, 281 (1898). *See, e.g*., *City of Guthrie v. Beamer*, *supra*; *Vilas v. Algar*, 109 F. 519 (9th Cir. 1901); *Townsite*

*Act*, 43 U.S.C. §§ 718, 721, repealed 90 Stat. 2789 (1976).  "[M]ere occupancy of the public lands and improvements thereon give no vested right therein as against the United States..." *Sparks v. Pierce*, 115 U.S. 408, 413 (1885).  A valid townsite on public lands in New Mexico requires that the townsite patent from the United States be filed with the county clerk of the county in which the townsite is situated.  NMSA 1978 § 19-4-1 *et seq*.

Defendants also suggest there is evidence that a mining district existed on the subject land. Historical mining districts have existed on portions of the Mescalero Apache Reservation, White Sands Missile Range, the LNS and White Sands National Monument.  Calhoun affidavit, ¶ 13, Figure 6.  The existence of a historical mining district does not change legal status of the land.  A "mining district" is not patented land.  A "mining district" is simply an area in which if gold or silver were to be found, mining would be allowed on the basis of rules and regulations prescribed by the miners residing in the district.  *U.S. v. Smith*, 11 F. 487 (1882).  Such miners' rules and regulations could not and cannot conflict with the laws of the United States.  30 U.S.C. §§ 22, 28; *Del Monte Mining & Milling Co v. Last Chance Mining & Milling Co*., 171 U.S. 55 (1898).  Miners' rules could not determine how title to the land may be acquired.  *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co*., 145 U.S. 428 (1892).  Moreover, public lands cannot be acquired by adverse possession, laches or acquiescence.  *United States v. California*, 332 U.S. 19 (1947).

Finally, as to the third exception, there is no evidence of any filing or selection of record concerning the land at issue.  A "selection" is a selection of land that upon survey is patented.  A selection may be made pursuant to various statutes.  *Frasher v. O'Connor,* 115 U.S. 102 (1985) (Plaintiff traced title to the land at issue to a patent of the state, whose title was derived from

selections of land in lieu of certain lands granted for school purposes by the Act of Congress of March 3, 1853); *U.S. ex rel. Santa Fe Pac. R.R, Co. v. Work*, 4 F.2d 172 (D.C. Cir. 1925) (Railroad permitted to select land and have patented in exchange for "any sections of their land grant in New Mexico, any portion of which was and had been occupied by any settler or settlers as a home or home-stead by themselves or their predecessors for more than 25 years...") (*Wilderness Socy. v. Carruthers* 1986 U.S. Dist. LEXIS 29836 (D.D.C. 1986) (interpreting the Alaska Native Claims Settlement Act).  There is no such evidence of a selection in this case.  As stated in the Patterson affidavit:

> "Not only would a selection appear in the records maintained by the Bureau of Land Management at its State Office in Santa Fe (BLM Records), a patent would have issued shortly afer acceptance of the township survey in 1930.  Here, there is no record in the BLM Records of any entry, selection or patent based thereon, for the Subject Property."

Patterson affidavit, ¶ 17.

> b.     *More valuable for mineral or agricultural purposes.*

As to Defendants' second assertion, a determination that the subject lands are more valuable for minerals than for inclusion into the National Forest System, this is a matter of law exclusively within the power of the Secretary of the Interior with the approval of the President.  16 U.S.C. § 482; *Pathfinder Mines Corp. v. Hodel*, 620 F. Supp. 336 (D. Ariz. 1985), *aff'd* 811 F.2d 1288 (9th Cir. 1987) ("Relying on the provisions of the statement of intent in the Organic Act, plaintiff argues that mineral lands within the forest reserve were excluded from the forest reserve and therefore were excluded from the Game Preserve.  It is clear, however, that the Act did not exclude mineral lands from the reserves, it merely provided a mechanism for eliminating lands from the reserve.")  By statute, only the Secretary of the Interior can exclude the land from the forest reserve and restore it

16

to the public domain.  16 U.S.C. § 482.  Defendants have presented no evidence that such a determination has been made by the Secretary of the Interior or the President of the United States.

Defendants' reliance on *United States v. Sweet*, 245 U.S. 563 (1918) is misplaced.  *Sweet* was a quiet title case involving a statehood school grant to Utah and cancellation of a patent.  *Sweet* did not involve or address forest reservations, the 1891 Creative Act, the 1897 Organic Act or the authority of the Secretary of the Interior to make a determination that forest lands were more valuable for their minerals than for forest purposes. Defendants reliance on *Borax Consolidated v. City of Los Angeles*, 296 U.S. 10 (1935) is also misplaced. *Borax* was a quiet title action between Borax and the City of Los Angeles and involved tidelands which passed to the state on admission to the Union.  The United States was not a party to the lawsuit.  The issue in *Borax* was whether the General Land Office had jurisdiction, including survey jurisdiction, over lands that belonged to the state.  The Court held that the General Land Office had jurisdiction over only United States public lands, and therefore had no power to convey by patent the tidelands in question.

Defendants have submitted no evidence that the land they are claiming was ever excluded from the 1907 Proclamation.  The BLM Master Title Plat and the Forest Service Status Plat demonstrate that no lands within the subject area were ever excluded.  Hickey declaration, ¶ 16.  The Master Title Plat and the Status Plat would show any conveyances of land ownership from the United States and none appear. Patterson affidavit, ¶ 11.  The Abstract of Title does not show any conveyance out of the United States ownership.  Nor have the Defendants provided any evidence to rebut the facts that according to the official BLM and FS land status records, the subject area has been owned continuously by the United States since 1848 and has been within the LNF since 1907. Calhoun affidavit, ¶¶ 9-10, 13, Figures 2-5; Hickey declaration, ¶¶ 10-16; Forest Service Status Plat,

Montoya declaration ("Exhibit "3") ¶¶ 3, 6-8 and attached BLM Master Title Plat and Presidential Proclamation Diagram; Patterson affidavit, ¶¶ 6,8,10,11,13, and 19.  These are facts that are not "specifically controverted."  Fed. R. Civ. P. 56(e); D.N.M.LR. Civ. 56(1)(b); *United States v. Campbell*, 2000 WL 1258344, *3 (D. Or. 2000) (finding that the United States had established ownership of the claim beyond "reasonable doubt" in relying on  "the Master Title Plat [as] the government's official record of land status...")   Defendants have provided no evidence of any patented land in the subject area.  Defendants rely solely on their unpatented mining claims.

      3.    *Unpatented  mining claims.*

Defendants assert they are owners of unpatented mining claims under the 1872 Mining Law. 30 U.S.C. § 22 provides: "all valuable mineral deposits in lands belonging to the United States...shall be free and open to exploration...and the lands in which they are found to occupation and purchase...under such regulations  prescribed by law..."  20 U.S.C. § 26 further provides that "[t]he locators of all mining locations...so long as they comply with the laws of the United States...shall have exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges through the entire depth."   As owners of unpatented mining claims, Defendants are subject to the United States' regulatory powers. *Manning v. United States*, 146 F.3d 808, 813-15 (10thCIr. 1998).

In 1955, Congress enacted the Surface Resources Act, 30 U.S.C. § 612 which further limited an owners use of unpatented mining claims. *United States v. Doremus*, 888 F.2d 630, 632 (9th Cir. 1989), *cert. denied,* 498 U.S. 1046 (1991) ("statutory right derive[d] from the provision in the 1872 Act which reserves to the claimant 'the exclusive right of possession and enjoyment of all the surface included within the lines of their locations***w[ere] limited by the Surface Resources [] Act of

1955***.").  The Act provides that mining claims can not be used "for any purposes other than prospecting, mining or processing oprations and uses reasonably incident" to such activities.  30 U.S.C. § 612(a). The Act further provides that the rights under any unpatented mining claim are subject to the right of the Untied Sates to manage the use of the resources on the land surface of the claim.  *Id.* at § 612(b).  The Act also provides that a claim holder may not use surface resources managed by the United States, or "construct [] buildings or structures," except as required for prospecting, mining or processing operations and uses "reasonably incident thereto."  *Id.* at 612(c). Thus, mining claimants have a non-exclusive right to possession and enjoyment of the surface estate overlying their claims.  The United States maintains fee title to the unpatented claims.  *United States v. Locke*, 471 U.S. at 105.[1]  There is simply no evidence that any lands within the subject area were ever conveyed by the United States.  Hickey declaration, Forest Service Status Plat; Montoya affidavit, Exhibit "3", BLM Master Title Plat; Patterson Affidavit, ¶¶ 6, 9-11, 15-19.

Defendants' unpatented claims are not excluded from inclusion in the national forests.  *United States v. Cook*, 71 IBLA 268 (1983), *aff'd* 1985 WL 6463 (E.D. Ca. 1985);

> [h]olding otherwise would create an impossible administrative situation where FS could not determine whether lands that are plainly within the borders of the national forests are under its administration.  There are literally thousands of mining claims on national forest lands, and many of them predate the setting aside of the land for inclusion in national forests.  If we adopted appellants' position, we would have to hold that all such claims create inholdings in the national forests and that only BLM could enter these claims.  The results would be to disrupt FS' orderly administration of lands within the borders of the national forests."  *Cook*, 1985 WL 6434, *2 .

------

[1]The holder of a mining claim may apply to the United States Secretary of the Interior to obtain a patent for the claim, which, if issued, conveys fee title to the claimant. *Independence Min. Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997). Defendants do not assert nor have they offered any evidence that they have a patent for the subject area.

*See Locke*, 471 U.S. at 86 (As of 1975, the United States Supreme Court observed that half of the National Forest Systems lands were thought to be covered by unpatented mining claims.) The United States maintains the fee title to unpatented claims. *Locke*, 471 U.S. at 105; *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976).

**Conclusion**.

For the foregoing reasons, the Court finds that the subject area has been owned continuously by the United States since 1848 and has been within the LNF since 1907.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment regarding Federal Ownership and Management of the Subject Lands (Docket No. 43) is granted and Defendants' Motion for Summary Judgment on Land Status Issues (Docket No. 45) is denied.

_____
**UNITED STATES MAGISTRATE JUDGE,
PRESIDING**

20